UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| CELESTE W.-S., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:18 CV 2 (JMB) |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On February 7, 2014, plaintiff Celeste W.-S. protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of July 15, 2004. (Tr. 191-94). After plaintiff's application for benefits was denied on initial consideration (Tr. 62-74), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 93-94) (accepted as an "informal request" for hearing).

Plaintiff failed to appear for the hearing held on July 13, 2016, and she had not communicated with her attorney, who was present. Vocational expert Chrisann Schiro Geist, Ph.D., offered testimony. The ALJ issued a decision denying plaintiff's application on September 13, 2016. (Tr. 19-36). The Appeals Council denied plaintiff's request for review on

November 3, 2017. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Deputy Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Prior Applications

In November 2006, plaintiff filed Title II and Title XVI applications with an alleged date of onset of July 15, 2004. These applications were denied at the initial level in January 2007 and closed in October 2008.[1] (Tr. 50; 47-48). In October 2013, plaintiff again filed Title II and Title XVI applications with an alleged date of onset of July 15, 2004. These applications were denied at the initial level on November 21, 2013. Id.

### B. Disability and Function Reports and Hearing Testimony

Plaintiff was born in September 1975 and was 28 years old on the alleged onset date. (Tr. 191). She reported that she lived with her mother. (Tr. 266). Plaintiff listed her impairments as bipolar disorder, depression, mania, racing thoughts, anxiety, arthritis in hips, back and neck pain, post-traumatic stress disorder, high blood pressure, and anger issues. (Tr. 257).

Plaintiff completed a function report in February 2014. (Tr. 266-76). Her daily activities included showering, lying in bed, watching television and, occasionally, cooking. She sometimes let her mother's dog out. She stated that she was prevented from engaging in more activity due to her mental disorders and back pain. She had no difficulty in attending to her personal hygiene. As for household chores, she stated that she did laundry and picked up dirty clothes when her mother asked her to do so. She was afraid of having panic attacks and did not

---

[1] Plaintiff apparently requested a hearing after the initial determination but failed to appear. (Tr. 47-48).

go out except to go shopping once a month and to medical appointments. She usually went with her mother because she did not have a driver's license. She stated that she had no interests and spent her time in front of the television, "sitting and thinking a lot." She did, however, talk on the phone every day. She needed reminders to go places. She had difficulty getting along with others, she said, because a lot of people did not like her, but she had no difficulty with authority figures and had never lost a job due to conflict with others. Plaintiff was able to walk for a half mile before needing to rest for 20 minutes. Her attention was adequate to hold a conversation but not to watch a movie and she was able to follow written, but not spoken, instructions. When under stress, she felt like she might have a stroke. Plaintiff identified lifting as the only limitation imposed by her disabilities. By contrast, in November 2013, plaintiff identified lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, memory, and getting along with others as areas of difficulty. (Tr. 239).

Vocational expert Chrisann Geist was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, who could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and could occasionally stoop, kneel crouch, and crawl. In addition, the person was limited to simple, routine tasks, in an environment free of fast-paced productivity requirements, with few work place changes. Finally, the person was limited to making simple work-related decisions and having occasional interaction with the public, co-workers, and supervisors. (Tr. 42-43). According to Dr. Geist, such an individual would be able to perform work available in the national economy, such as housekeeper, light inspector, and light packing. All work would be precluded if the individual was off-task 25 percent of the time. Id.

B. **Medical Evidence**

1. Medical Records

Plaintiff's sole claim is that the ALJ improperly gave little weight to the opinion of plaintiff's mental health provider, Nurse Practitioner Wanda Horn. Accordingly, the Court's review of the records will focus on plaintiff's mental health conditions and their treatment.[2]

Plaintiff received psychiatric and counseling services from Community Counseling Center (CCC) off and on between 2004 and 2014, with lengthy gaps during periods of incarceration.[3] Between August and October 2004, plaintiff had five counseling sessions with therapist Charlie Harrison, M.S., after her husband of fourteen years shot himself following an angry confrontation with her. (Tr. 446-48, 445, 444, 443, 422-23). During this time, plaintiff had multiple stressors, including the temporary removal of her children by the Division of Family Services, angry confrontations with her in-laws, the need to move out of the home in which her husband shot himself, and inadequate resources. She was also on probation for a controlled substance offense. Ms. Harrison diagnosed plaintiff with post-traumatic stress disorder (PTSD). Plaintiff's primary care physician agreed to prescribe Xanax for her at two-week intervals until a psychiatric evaluation could be completed. Plaintiff generally presented with an anxious and/or depressed affect. In October 2004, it was noted that plaintiff was in jail. (Tr. 441).

---

[2] Starting in April 2013, plaintiff sought treatment for back pain. (Tr. 370-77). She eventually received care through a pain center. (Tr. 415-19).

[3] She had previously received services at CCC between November 1999 and October 2000. (Tr. 449)

On November 4, 2004, Jim F. Kerr, D.O., a psychiatrist at CCC, completed an evaluation of plaintiff after she contacted CCC's emergency department. (Tr. 427-29). In addition to coping with her husband's suicide, plaintiff reported that her best friend had recently shot herself. Plaintiff previously worked in nursing homes as a certified nursing assistant or medical technician, but she had not worked since her husband's death and was receiving Social Security survivor's benefits. She recently served 10 days in jail after being arrested for marijuana possession and was placed on probation for two years. She was living with her mother, with whom she had a good relationship. She reported that she had trouble sleeping and cried frequently. On mental status examination, she was alert and cooperative. She was tearful on occasion. Her affect was appropriate and she was moderately depressed. She was not suicidal. She was fully oriented, with logical, well-organized thoughts and coherent, relevant speech. She appeared to have normal intelligence and fair insight and judgment. Dr. Kerr diagnosed her with dysthymic disorder, unresolved grief reaction, and marijuana abuse. Her GAF was 65. Dr. Kerr planned to prescribe antidepressant medications and recommended she continue in psychotherapy. Dr. Kerr did not have further contact with plaintiff until August 2005, when he noted that she was in jail for driving on a revoked license. (Tr. 440).

On August 4, 2006, Reeta Rohatgi, M.D., a psychiatrist at CCC, competed a psychiatric evaluation. (Tr. 424-26). Plaintiff reported that her children had been returned to her custody in February 2006. She had periods of depression, with crying spells, poor appetite, and weight loss. She felt anxious and nervous. She had taken multiple medications in the past and thought that

Klonopin[4] and the antidepressant Effexor were helpful, but she was not sure she could afford them. On mental status examination, plaintiff was alert and fairly cooperative. Her mood was depressed, anxious, and nervous, with periods of tearfulness. She denied having suicidal or homicidal thoughts, paranoia, or hallucinations. She was fully oriented. Dr. Rohatgi diagnosed plaintiff with major depression, recurrent, severe, with superimposed dysthymia; anxiety disorder; and PTSD. Plaintiff's GAF score was 58. Dr. Rohatgi recommended continued treatment with Klonopin and the antidepressants Effexor and Remeron, along with individual counseling.

In December 2006, plaintiff was involuntarily hospitalized on a 96-hour hold after she overdosed on Klonopin. (Tr. 506-07; 508-14). She required intubation and short-term ventilator support. (Tr. 508; 576-78). It was noted that her current boyfriend was killed in a motor vehicle accident on his way to the hospital, something that plaintiff had not yet been told. (Tr. 512). At admission to the Poplar Bluff Regional Medical Center, plaintiff was described as uncooperative, hostile, and using profanity. Her mood was dysphoric, her affect was blunted, and her flow of thought was logical and coherent. Id. She denied substance use, despite testing positive for cannabis, opioids, and cocaine. (Tr. 511). Plaintiff was discharged on December 22, 2006, with the expectation that she would follow-up with Dr. Rohatgi on an outpatient basis. (Tr. 531). Her GAF at discharge was 55. (Tr. 515).

---

[4] Klonopin is a benzodiazepine prescribed for the treatment of seizure disorders and panic disorder. See https://medlineplus.gov/druginfo/meds/a682279.html (last visited Dec. 19, 2018).

There is no evidence of further medical treatment until June 2009, when plaintiff returned to CCC where she again saw Dr. Kerr. (Tr. 436). She reported that she wanted to earn her GED[5] and attend college. She was continuing to receive Social Security death benefits. Her son was in rehabilitation treatment. Dr. Kerr noted that plaintiff's sleep was improved, she had a good appetite, and her mood had improved. On examination, her mental status was unremarkable. She was diagnosed with bipolar disorder and assigned a GAF of 60. She was prescribed Klonopin and the antidepressants Trazodone and Effexor. In August 2009, Dr. Kerr noted that plaintiff had been charged with stealing controlled substances and owed her attorney $4,000. (Tr. 435). On examination, she was cooperative, but making a lot of gestures. She had a labile affect and an angry, worried mood. Her GAF was 60. She continued on the same medications. In October 2009, Dr. Kerr noted that plaintiff was placed on probation for 5 years. Her GAF was 70. (Tr. 436). The next month, she reported that she had violated her probation and received a 30-day sentence. Her GAF remained at 70. (Tr. 433). In January 2010, Dr. Kerr noted that plaintiff was living with a boyfriend after being released from jail. (Tr. 432). She was on probation and was required to get a job or go to school. She reported being very anxious. Her diagnosis of bipolar disorder remained unchanged and her GAF was 71.

On April 23, 2010, plaintiff entered inpatient treatment for drug dependence, following a three-day incarceration. (Tr. 479). Plaintiff reported that she was not a daily user, but binged. Id. Her GAF at admission was 48. (Tr. 478). She was discharged on May 21, 2010. (Tr. 473).

In June 2010, plaintiff told Dr. Kerr that she had been in a motor vehicle accident and was arrested for having an open container of alcohol. (Tr. 431). She continued to carry a

---

[5] According to plaintiff's 2004 intake interview at CCC, plaintiff left school in the eleventh grade but later earned a GED. (Tr. 423).

diagnosis of bipolar disorder, with a GAF of 68. She was prescribed Effexor and Trazodone. In October 2010, Dr. Kerr noted that plaintiff was attending group therapy at the Gibson Recovery Center twice a week. (Tr. 430). Her GAF was 63.

The record contains another two-year gap. On October 25, 2012, Daniela Kantcheva at CCC noted that plaintiff had been incarcerated for 12 months for stealing from her employer. (Tr. 348). She was living on her own and was unemployed. She complained of depression and anxiety and reported having a lot of rage and anger and wanted to resume medication. She was started on Tegretol[6] and the antidepressant Celexa. John Anderson, MA, completed an intake with patient that same day. (Tr. 450-53). Plaintiff reported that she was finding it difficult to cope with anything. She was very emotional and cried several times a day. She had episodes of severe rage and blacking out. Her mood was depressed and she avoided leaving the house. She slept a lot. Her appetite was good. Mr. Anderson described plaintiff as cooperative with appropriate eye contact and grooming. She had normal speech patterns and her thought processes were logical and coherent. She was alarmed by her inability to control her behavior. She was diagnosed with Bipolar I disorder and assigned a GAF of 49.

On December 5, 2012, plaintiff reported to Dr. Kerr that she was serving a six-month period of probation. She lived with her mother in a trailer and babysat her grandchildren every day. (Tr. 454-56). She was very depressed and anxious, with increased irritability, and was becoming more isolated. She had mood swings and poor sleep. She was alert and oriented and generally cooperative. She was tearful at several points. Her insight and judgment were assessed as poor to fair. Dr. Kerr diagnosed plaintiff with bipolar disorder, mixed type; history

---

[6] Tegretol is an anticonvulsant that can be used to treat episodes of mania or mixed episodes in patients with bipolar I disorder. https://medlineplus.gov/druginfo/meds/a682237.html (last visited Dec. 19, 2018).

of polysubstance abuse and marijuana abuse; and borderline-type personality disorder. Her current GAF was 55. Plaintiff was started on lithium carbonate for bipolar disorder, Vistaril for anxiety, and Remeron for sleep problems. Plaintiff missed several appointments at CCC until August 2013. (Tr. 343, 342, 339, 338). At that time, plaintiff told Dr. Kerr that she continued to babysit her grandchildren and was struggling with irritability, racing thoughts, and poor sleep and appetite. (Tr. 337). He noted that she had slightly pressured speech. Her mood was variable. Dr. Kerr resumed her prescriptions for lithium carbonate, Remeron, and Klonopin. Her GAF was 55.

Plaintiff was seen for medication management on November 14, 2013. (Tr. 463). She reported that she was tolerating her medications and generally doing well. She was directed to obtain blood tests to determine her lithium levels and to continue with her medications. On November 19, 2013, however, she told a different provider at CCC that she wanted an increased dosage of Klonopin and wanted to start taking Lunesta[7] and pain pills. (Tr. 462). She had not yet obtained a blood test to obtain a lithium level. In December 2013, plaintiff reported that she had been referred to a pain clinic for neck and low back pain. (Tr. 462, 387-89, 401-03). She was taking care of her son's three young children and had been arguing with her boyfriend and described her mood as "up and down." Nonetheless, there was no change in her mental status and she was directed to continue on her present medications. On February 4, 2014, plaintiff reported that her boyfriend had been killed. She also reported that she had not been taking her prescribed Klonopin because she preferred Xanax. (Tr. 460). The provider recommended that

---

[7] Lunesta is a hypnotic used to treat insomnia. https://medlineplus.gov/druginfo/meds/a605009.html (last visited Dec. 20, 2018).

she take Klonopin and started a clinical trial of clonidine to address her elevated blood pressure and anxiety. Two weeks later, plaintiff reported that she thought the clonidine was helping. She still had not gotten the lithium blood test. Her Klonopin dosage was increased. (Tr. 459). That was last appointment plaintiff kept at CCC. (Tr. 457-58).

In July 2014, plaintiff began treatment with Wanda Horn, PMHC, at River City Health Clinic. (Tr. 716). She complained that she was depressed, very anxious and nervous, and was having mood swings. She reported that her last provider at CCC refused to prescribe the medications she wanted. Ms. Horn diagnosed plaintiff with bipolar disorder and prescribed Topamax,[8] Klonopin, and Lunesta. In August 2014, plaintiff complained of anxiety, irritability, restlessness, occasional crying, and racing thoughts. She reported that she was sleeping normally and had normal concentration and appetite and denied loss of interest in activities. (Tr. 713-14). She found the medications to be helpful. Her diagnoses were bipolar disorder, mixed, generalized anxiety disorder, and insomnia. On September 2, 2014, plaintiff complained of increased stress, depression, and anxiety arising from relationship stress. (Tr. 712). Ms. Horn discontinued plaintiff's prescription for Lunesta.

Plaintiff was admitted to Southeast Hospital on September 22, 2014, after ingesting bath-salts. (Tr. 725-27; 721-22). She was discharged on September 26, 2014, with prescriptions for antipsychotic medications, a muscle relaxer, Topamax, Neurontin, and a tapering dosage of Klonopin. Her diagnoses at discharge were substance-induced psychosis, bipolar disorder, polysubstance abuse, antisocial personality disorder, and chronic pain. Her GAF was 30 at

---

[8] Topamax is an anticonvulsant mediation that can also be used to manage alcohol dependence. https://medlineplus.gov/druginfo/meds/a697012.html (last visited Dec. 20, 2018).

admission but rose to 50 at discharge. Plaintiff followed up with Ms. Horn at River City Health Clinic on September 29, 2014. (Tr. 709-10). Ms. Horn noted that plaintiff's medications had been changed during her hospitalization and that she found them helpful. Plaintiff reported that she had increased stress and was struggling with making decisions. Ms. Horn noted that plaintiff was cooperative and anxious, but had decreased eye contact and rapid speech. Otherwise, her mental status examination was unremarkable. Ms. Horn prescribed Klonopin, Topamax, and two antipsychotic medications.

In December 2014, plaintiff told Ms. Horn that she woke up multiple times at night. (Tr. 707-08). She complained of depression, anxiety, stress, agitation, and loss of energy. Ms. Horn noted that plaintiff had not been taking her medications since October, due to insurance problems. Plaintiff was trying to complete paperwork to enroll in patient assistance programs. Her medications were Klonopin and Saphris.[9] Plaintiff's condition had not improved by her next visit in January 2015. (Tr. 703-04). She complained of frequent crying, sleep problems, and a lack of energy, which Ms. Horn attributed to her medication schedule. She also had stress arising from an upcoming court date for one of six motor vehicle accidents she had had in the past year. Ms. Horn noted that plaintiff was disheveled and fidgety, with an anxious, depressed mood. Ms. Horn continued plaintiff's medications, but had her change the schedule on which she took them. Plaintiff was to return in one month.

The next treatment note from River City Health Clinic is dated July 14, 2015. (Tr. 701-02). Plaintiff complained of bad dreams, anxiety and depression. (Tr. 701-02). With the exception of a depressed mood, her mental status examination was unremarkable. Ms. Horn

---

[9] Saphris is an antipsychotic and can be used to treat or prevent episodes of mania for those with bipolar I disorder. https://medlineplus.gov/druginfo/meds/a610015.html (last visited on Dec. 20, 2018).

11

continued plaintiff's previous medications. In August 2015, plaintiff told Ms. Horn that the medications were helpful. (Tr. 699-700). She was sleeping normally and her anxiety and racing thoughts had improved. She still complained of depression and stress arising from family conflict, but reported that she was not worrying as much about things she could not change. Ms. Horn noted that she had talked with plaintiff about refraining from using alcohol and illegal drugs and renewed her prescriptions. In October 2015, Ms. Horn noted that plaintiff had normal sleep and appetite, and was cooperative and friendly. (Tr. 695-96). She continued to report anxiety, depression, sadness, frequent crying, stress, and racing thoughts. Ms. Horn added Valium to plaintiff's medications and discontinued Klonopin.

Plaintiff saw Ms. Horn again in April 2016. (Tr. 737-38). Plaintiff reported difficulty falling asleep, after which she was able to sleep five or six hours. She had occasional anxiety, depression, crying, and racing thoughts.

       2.    <u>Opinion evidence</u>

On March 11, 2014, State agency consultant Joan Singer, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 66-68). Dr. Singer concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.09 (substance abuse disorders). Dr. Singer found that plaintiff had mild restrictions in the activities of daily living and in maintaining social functioning, and moderate restrictions in maintaining concentration, persistence and pace. She had no repeated episodes of decompensation of extended duration. Dr. Singer noted that plaintiff had a history of intermittent outpatient mental health treatment. The evidence showed that she had a good response to medication but she was not consistent and was prone to requesting specific

12

medications. She had suffered a number of stressful events, which likely caused her stress, but her clinical examinations did not show marked deficits in her mental status. By her own reports, plaintiff was able to follow written instructions and had sufficient concentration to complete tasks. Dr. Singer also completed a mental residual functioning capacity assessment in which she found that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. She was otherwise without significant limitations. (Tr. 70-71). The ALJ assigned this opinion significant weight. (Tr. 29).

Wanda Horn supplied a two-page Medical Source Statement on January 6, 2016. (Tr. 718-19). Ms. Horn listed plaintiff's diagnoses as bipolar mixed, generalized anxiety, and insomnia. She opined that plaintiff would be off task at least 25% of the time. In addition, she found that plaintiff was markedly or extremely limited in all but one of 20 abilities related to the capacity to work. Ms. Horn did not complete the section of the form asking her to identify the basis for her opinion. The ALJ gave this opinion little weight, concluding that it was not supported by plaintiff's largely stable mental status examinations, was inconsistent with plaintiff's reported level of functioning, and did not address plaintiff's substance abuse. (Tr. 27, 29).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th

Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646

F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 22-30). The ALJ found that plaintiff had not engaged in substantial gainful activity since February 7, 2014, the application date. (Tr. 24). At steps two and three, the ALJ found that plaintiff had the following severe impairments: degenerative disc disorder, bipolar disorder, generalized anxiety disorder, personality disorder with borderline and antisocial personality traits, and a history of polysubstance abuse. The ALJ next determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ found that plaintiff's mental impairments, considered singly and in combination, did not meet the listing criteria for listing 12.04 (affective disorders), 12.06 (anxiety disorders), 12.08 (personality and impulse-control disorders), or 12.09 (substance addiction disorders). (Tr. 25). For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild restrictions in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. Plaintiff had no episodes of decompensation of extended duration. Id.

16

The ALJ next determined that plaintiff had the RFC to perform light work but could only occasionally kneel, stoop, crouch and crawl, and could never climb ladders, ropes, or scaffolds. In addition, she was limited to simple, routine tasks in a work environment free of fast-paced productivity requirements, involving simple decisions with few changes. She could occasionally interact appropriately with the public, coworkers, and supervisors. (Tr. 25-26). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's written reports regarding her abilities, conditions, and activities of daily living. (Tr. 26). While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent with" the medical and other evidence. (Tr. 28).

At step four, the ALJ concluded that plaintiff had no past relevant work. Her age placed her in the "younger individual" category on the application date. She had left school in the 11th grade but subsequently earned a GED and was a certified nursing assistant and medical technician. (Tr. 29). Transferability of job skills was not an issue because plaintiff did not have past relevant work. Based on the vocational expert's testimony, the ALJ found at step five that someone with plaintiff's age, education, and residual functional capacity could perform work that existed in substantial numbers in the national economy, namely in housekeeping, light inspection, and light packing. (Tr. 30). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, since February 7, 2014, the date of her application. Id.

## V. Discussion

Plaintiff argues that the ALJ erred in failing to give substantial or controlling weight to the opinion of Wanda Horn, her treating mental health provider.

As a general matter, the well-supported opinion of a treating physician is entitled to controlling weight if it is not inconsistent with other substantial evidence. See Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)). In this case, however, Ms. Horn is a nurse practitioner and thus is not an "acceptable medical source," as defined by the regulations that apply here; rather, she is an "other medical source."[10] Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources." Id. (citations omitted). Thus, "other sources" are not entitled to controlling weight. Franklin v. Berryhill, No. 4:17CV2298 HEA, 2018 WL 4679736, at *3 (E.D. Mo. Sept. 28, 2018) (citing LaCroix v. Barnhart, 465 F.3d 881, 885-86 (8th Cir. 2006)). The ALJ did not err in failing to give Ms. Horn's opinion the same weight that would be given to a treating physician.

In addition, Ms. Horn's opinion is reflected in a two-page checklist, portions of which were left blank. In particular, Ms. Horn did not answer a question asking her to indicate the basis for her conclusion. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("The

---

[10]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. See 20 C.F.R. § 404.1502 (including licensed advanced practice nurses in the definition of "acceptable medical source" for claims filed on or after March 27, 2017).

checklist format, generality, and incompleteness of the assessments limit [their] evidentiary value.") (citation omitted).  The Eighth Circuit has "often noted that the MSS form 'consists of a series of check marks assessing residual functional capacity, a determination the ALJ must make, which are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record.'"  Adkins v. Comm'r, Soc. Sec. Admin., No. 18-1323, 2018 WL 6625772, at *3 (8th Cir. Dec. 19, 2018) (quoting Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011); citing Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018); Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014); Teague v. Astrue, 638 F.3d 611, 615-16 (8th Cir. 2011)).  Here, the severity of the limitations found by Ms. Horn are inconsistent with the results of mental status examinations — whether performed by Ms. Horn or other providers — which routinely reflected a much greater level of functioning.  Finally, Ms. Horn did not address the impact that plaintiff's substance abuse had on her capacity to work  a relevant factor in the disability determination.  See 42 U.S.C. § 423(d)(2)(C) (an individual is not considered disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.").

The ALJ gave significant weight to Dr. Singer's opinion that plaintiff was able to understand and remember instructions, had sufficient concentration to complete simple tasks, and had social skills adequate to managing work interactions.  Plaintiff argues that ALJ erred in giving Dr. Singer's opinion this weight because she was a non-examining source.  Dr. Singer's opinion was consistent with the other medical evidence and thus it was proper for the ALJ to rely on it, in part, in formulating plaintiff's RFC.  See Mabry v. Colvin, 815 F.3d 386, 390–91 (8th Cir. 2016); Stormo v. Barnhart, 377 F.3d 801, 807–08 (8th Cir. 2004) (the ALJ properly used

evidence from state agency doctors in supporting the finding that the claimant's mental impairments were not disabling).

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of January, 2019.